In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-3621

DIANA L. VAIL,

*Plaintiff-Appellant,*

*v.*

RAYBESTOS PRODUCTS COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-CV-544—**Richard L. Young**, *Judge.*

———————

ARGUED APRIL 18, 2008—DECIDED JULY 21, 2008

———————

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Diana Vail is a former employee of Raybestos Products Company. Vail suffers from migraine headaches, a condition that required her periodically to take medical leave from her job there. In October 2005, Raybestos fired Vail for abusing her leave. Clandestine surveillance had caused Raybestos to suspect that, while supposedly on leave, Vail had actually been working for a family business. This lawsuit followed, alleging that Raybestos had violated both the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, and the terms of a collective bargaining agreement covering Vail. Follow-

ing discovery, the district court granted Raybestos's motion for summary judgment on both counts. This appeal followed, and for the reasons set out below, we affirm.

## I. Background

All the relevant facts in this case occurred over the summer and fall of 2005. At the time, Diana Vail worked the third shift for Raybestos Products Company, a manufacturer of car parts with a factory in Crawfordsville, Indiana. Working the third shift meant coming in at 10:45 at night and clocking out at 6:45 the next morning. Vail was by all measures a good worker. But her job at Raybestos was complicated by the fact that she suffered from migraines, which, when present, would keep her from work. Her supervisors were aware of her condition and had approved the use of intermittent medical leave in April 2004.

This case stems from Vail's use of that leave from May through September 2005. Over this period, she received more than thirty-three days of approved leave. Given that her migraines crept up on her on short notice, Vail would call in just prior to her evening shift to tell her supervisor that she would not be coming in. As the summer progressed and Vail's use of her leave became more frequent, her supervisors at Raybestos began to suspect that her requests were not entirely genuine. This suspicion stemmed from the fact that they knew Vail's husband had a lawn-mowing business and that Vail would help him out part-time. Among her husband's customers were several cemeteries, which generally preferred to have their lawn-mowing done at the quiet times during the day throughout the

workweek—less as a courtesy to its residents than to those who would come to visit. The summer and fall were prime mowing seasons, and Vail's requests for leave began to stack up, mostly coming during the workweek when Vail's husband would need to mow the cemeteries. Putting all this together, Raybestos decided to probe a little further into what Vail was doing while on leave. To that end, Raybestos engaged the services of Sergeant Largent of the Crawfordsville, Indiana Police Department to monitor Vail's activities while he was off-duty.

After her shift ended on the morning of October 6, 2005, Vail went to see Dr. Amber Hussain, her treating physician. Dr. Hussain prescribed a different blood-pressure medication to treat Vail's migraines and instructed her not to work for twenty-four hours after first taking the medication. As a result, Vail called prior to her shift later that day to request leave, which Raybestos granted. The next morning around 10:16 AM Vail called Dr. Hussain and asked her to submit a note to Raybestos explaining why she had been absent from work, which she agreed to do. About ten minutes later, Vail left her house and, under Sergeant Largent's watchful eye, filled up two lawn mowers at a nearby gas station. She then proceeded to take both mowers to the New Richmond Cemetery where she and another person mowed the lawn. Upon seeing this, Sergeant Largent called the director of human resources at Raybestos, Elizabeth Sowers, to pass along his reconnaissance information. That afternoon, Vail called in again saying that she would be requesting medical leave for her shift beginning October 7 due to the onset of a migraine. Prior to this call, Raybestos had received Dr. Hussain's note, which it interpreted as another request for leave that night.

The information relayed from Sergeant Largent convinced Sowers that Vail was abusing her leave. In addition, Sowers thought that Vail had violated a specific provision of the collective bargaining agreement covering Vail's union that banned physical labor for profit while on approved leave. That provision stated:

> An employee shall lose his seniority and right to be on the seniority list: (f) If an employee requests and is granted a leave of absence from the Company and while on such leave of absence accepts and performs other gainful employment or provides physical labor to operate any type of business enterprise for profit unless specific permission has been granted by the Company.

Based on the perceived abuse of leave and the violation of the collective-bargaining agreement, Sowers notified Vail's union representative of her decision to terminate Vail. The union did not object.

When Vail next reported to work, Vail's manager informed her that she was being terminated. The next day, Vail met with Sowers, the superintendent of her department and her union representative, Gary Bryant. Bryant told Vail that based on his view of the evidence, it was a "closed, shut case." In the meeting, Vail heard what Sergeant Largent had passed along to Sowers and did not question or challenge the decision during the meeting. She received a termination notice, which gave the following as the reason for her termination:

> Management became aware on 10/07/05 that Ms. Vail was performing physical labor while on FMLA. As a result of this action Ms. Vail's employment was terminated on 10/07/05 at 10:45 pm.

Vail signed this termination notice and did not file a grievance using the procedures set out in the collective-bargaining agreement. Instead, she filed this lawsuit alleging that Raybestos had breached the collective-bargaining agreement and violated the Family Medical Leave Act, 29 U.S.C. § 1611, *et seq.*, when it terminated her. Following discovery, the district court granted Raybestos's motions for summary judgment on both counts. The court reasoned that Vail's failure to follow the procedures set out in the collective-bargaining agreement meant that she could not allege a breach in court. And because Raybestos had an "honest suspicion" that Vail was abusing her medical leave, it did not violate the FMLA. This appeal followed.

## II. Discussion

Vail raises two issues on appeal: whether Raybestos breached the terms of the collective bargaining agreement covering her union and whether it interfered with her rights under the FMLA by terminating her. The following sections discuss each in turn.

### A. Labor Management Relations Act Claim

In the district court and here on appeal, Vail has argued that Raybestos terminated her in violation of the collective bargaining agreement covering her and her union. Specifically, she claims that she did not "accept[ or] perform[ ] other gainful employment or provide[ ] physical labor" while on leave. Her theory is that her "leave" ended when her shift did on the morning of October 7, 2005, which is 6:45 AM. As a result, the

mowing that Sergeant Largent witnessed a few hours later did not occur when she was on "leave." The suspicion that her lawn work had violated the collective bargaining agreement was, in her opinion, unfounded.

It is unnecessary to pass over Vail's interpretation of the collective bargaining agreement because the claim is not properly before us. This Court reviews the substantive provisions of a union's collective bargaining agreement by virtue of Section 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185(a). That statute gives the federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . without respect to the amount in controversy or without regard to the citizenship of the parties." *Id.* As a general matter, however, exercising this power should be the last step in resolving a dispute over the terms of a collective bargaining agreement. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). Collective bargaining agreements frequently provide private mechanisms for handling disputes. And "individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress" before courts will get involved. *Id.*; *Clayton v. Intl. Union, United Auto., Aerospace, and Agricultural Implement Workers of America*, 451 U.S. 679, 685-86 (1981). Otherwise, the judiciary may marshal its scarce resources to resolve disputes that the parties could have resolved privately.

Here, the collective bargaining agreement in dispute had a grievance procedure that applied when Raybestos terminated someone covered by the agreement. The relevant provision states:

> When the Company determines to discharge an employee for cause, [s]he shall be suspended immediately and given a written notice of discharge, and the aggrieved employee, if [s]he feels [s]he has a grievance, shall file a written grievance with a member of the Union [and so on up to and including a hearing.]

Upon receiving her notice of termination, Vail chose not to avail herself of this grievance procedure, instead filing this lawsuit. Nor did she press her claim with the union following her discharge, meaning she has not "attempt[ed] use of the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel Corp.*, 379 U.S. at 652.

The general rule stated above has exceptions, and unless one of these exceptions applies, Vail's failure to resolve her grievance privately means that we cannot do so now. This Court has the discretion to hear disputes concerning the terms of a collective bargaining agreement notwithstanding the failure to exhaust when: (1) the union has exhibited sufficient hostility to the employee's claim to preclude a fair hearing; (2) the internal procedures are inadequate "either to reactivate the employee's grievance or to award h[er] the full relief [s]he seeks under § 301"; or (3) the "exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." *Clayton*, 451 U.S. at 689. Vail does not argue here that any of these applies; so, for the reasons stated above, her claim based on the collective bargaining agreement necessarily fails.

**B.  FMLA Claim**

Vail also challenges her termination on the grounds that it interfered with her rights under the FMLA. The FMLA entitles eligible employees "to a total of 12 work-weeks of leave" for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The point is essentially to freeze for twelve weeks the conditions of employment enjoyed by the employee prior to taking her leave. Thus, at the end of the leave, the employee can return to the job she held prior, 29 U.S.C. § 2614(a)(1)(A), with the same benefits she had when she left, *id.* at § 2614(a)(2). But this "right to reinstatement is . . . not absolute." *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001). The employee only gets the same employment terms she had when she left—nothing more. In other words, the statute "set[s a] substantive floor[ ]." *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997). Aside from the twelve weeks of leave, it does not confer "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* at § 2614(a)(3)(B).

The issue in Vail's case is whether she was abusing her leave or whether Raybestos interfered with her rights when it fired her. To make out a claim for interference, a plaintiff must show that she is an "eligible employee," 29 U.S.C. § 2611(2), who took leave "for the intended purpose of the leave," 29 U.S.C. § 2614(a)(1), and whom the employer then denied a benefit as a result of

that leave, 29 U.S.C. §§ 2614(a)(3), 2615(a)(1).[1] Accordingly, an employer can defeat an interference claim by showing, among other things, that the employee did not take leave "for the intended purpose." *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006) ("[A]n employer is under no obligation to reinstate an employee who misuses disability leave."). We have interpreted this to mean that an employer has not violated the FMLA if it refused to reinstate the employee based on an "honest suspicion" that the she was abusing her leave. *Id.*; *Kariotis*, 131 F.3d 680-81.

Here, Raybestos has clearly made this showing. Though the use of an off-duty police officer to follow an employee on leave may not be preferred employer behavior, employers have certainly gone further than Raybestos. *See, e.g.*, *Kariotis*, 131 F.3d at 681 (hiring private investigators to videotape employee). In any event, the information gleaned from Sergeant Largent's reconnaissance was sufficient to give Raybestos an "honest suspicion" that Vail was not using her leave "for the intended purpose." Vail had taken medical leave for her October 6, 2005 evening shift. The next morning, the off-duty police

---

[1] Raybestos argues that Vail's FMLA claim is really a dressed-up version of her collective-bargaining-agreement claim. But the district court never heard this argument, which means it is waived. *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997) ("[W]e must take [the] case as she presented it to the district court."). Besides, an employer does not interfere with FMLA rights if it had an "honest suspicion" that the employee was abusing her leave. Showing this does not depend on resolving the relative contractual rights of the parties, such as by interpreting the terms of the collective bargaining agreement.

officer saw Vail working for her husband's lawn-mowing business. Raybestos received this information after it already suspected that Vail was gaming her leave in order to work for her husband's business. So when it heard information consistent with what they suspected she was doing while on leave, Raybestos decided to terminate her. Vail's call later that day—after a day of mowing under Sergeant Largent's gaze—stoked this suspicion. As a result of this "honest suspicion," Raybestos did not violate Vail's rights under the FMLA.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.