In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-2239 & 07-2263

JACK BELL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DAIMLERCHRYSLER CORP.,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 C 0241—**John Daniel Tinder**, *Judge.*

ARGUED JANUARY 25, 2008—DECIDED OCTOBER 29, 2008

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), the plaintiffs-appellants brought suit in the district court alleging that defendant-appellee DaimlerChrysler Corporation ("Chrysler") breached its contractual obligations to certain workers laid off in the late 1970s and early 1980s by failing to recall these workers for job openings at Chrysler's plants in Kokomo, Indiana. The district court granted summary judgment in favor of Chrysler,

reasoning in part that the plaintiffs had failed to exhaust their intra-union remedies prior to bringing suit. *Bell v. Daimler Chrysler Corp.*, 2007 WL 1266773 (N.D. Ill. May 1, 2007). We agree and affirm.

## I.

The plaintiffs are current or former employees of Chrysler who, as of the late 1970s, were working at a Chrysler plant in New Castle, Indiana. All of the plaintiffs were members of the United Auto Workers, Local 371 ("Local 371").

The late 1970s were not a happy time for Chrysler and its workforce. Foreign automakers had made substantial inroads into the U.S. automobile market during that decade, and gasoline shortages and price increases in the mid and late 1970s had made larger and less fuel-efficient American cars increasingly unattractive to the American consumer. Chrysler's situation became so precarious that it took $1.5 billion in federal loan guarantees to keep the company out of bankruptcy. Many Chrysler workers lost their jobs. Beginning in 1978 and continuing through 1980, Chrysler laid off hundreds of workers from its New Castle plant. The plaintiffs were among those laid off. The reduction in the New Castle workforce proved to be long-lasting: not until the early 1990s did Chrysler begin to make significant numbers of new hires at that plant.

Chrysler and UAW were parties to a series of collective bargaining agreements and accompanying side or "letter" agreements that governed the terms of the plaintiffs'

employment. There were more than seventy of these letter agreements, which were separately collected in a document entitled "Letters, Memoranda and Agreements" and colloquially referred to as the "Book of Letters." It appears from the record that the Book of Letters was updated and republished each time a new collective bargaining agreement was finalized. Some but not all of the letter agreements also were appended to the 1979 Master Agreement and its successor agreements. The plaintiffs represent that the Book of Letters was not distributed to union members, that they were unaware of it at the time of their layoff, and that they did not become aware of the Book of Letters until shortly before this suit was filed in 2003.

Section 65(b) of the 1979 Master Agreement between Chrysler and UAW accorded employees who had been laid off "work opportunity" rights that gave the laid-off workers priority over "off the street" applicants—typically, people who had never before worked at Chrysler—for any job openings at another Chrysler facility within the same "labor market area," which was circumscribed by a radius of 50 miles from the plant where the employee had worked. A series of successive letter agreements— Numbers 11 (dated November 5, 1976), 64n (dated October 25, 1979) and 85n (dated December 10, 1982)—expanded the re-employment rights of laid-off workers beyond their labor market areas to include openings at plants within the same state that were more than 50 miles away from the plant where they had formerly worked. That expanded range meant that workers who had been laid off from the New Castle plant had work opportunity rights at Chrysler's multiple plants

in Kokomo, Indiana, which was more than 50 miles from the New Castle plant. The plaintiffs aver that they were not aware of these extended rights at the time of their layoff or in the ensuing years because the relevant letter agreements were not attached to the collective bargaining agreements in force during those years and because the Book of Letters had not been provided to them.

Between January 1, 1984, and December 31, 1987, while the plaintiffs were still on layoff from their jobs at the New Castle facility, Chrysler hired 775 or more people off the street to work at its Kokomo plants. Contrary to the terms of Letter Agreements 11, 64n, and 85n, these jobs were not first offered to the plaintiffs. For purposes of summary judgment below, Chrysler conceded that it had violated the plaintiffs' work opportunity rights in making these off-the-street hires.[1] Chrysler's failure to offer the Kokomo jobs to the plaintiffs had lasting effects beyond the loss of particular employment opportunities.

---

[1] There is a dispute between the parties over whether employees were required within forty-five days of their layoff to sign letters expressing interest in employment at other plants in order to preserve their work opportunity rights. Many of the plaintiffs, evidently, did not such sign such letters. But we need not decide whether the failure to execute such letters precludes the plaintiffs from claiming a violation of their work opportunity rights. As we have just noted, Chrysler has acknowledged, for purposes of summary judgment, that the off-the-street hirings at its Kokomo plants violated the plaintiffs' work opportunity rights.

A laid-off employee's work opportunity rights were limited to a window of time equal to the length of his employment with Chrysler or five years, whichever was greater. If an individual did not return to employment with Chrysler during that recall window, he lost the seniority he had accumulated with the company prior to his layoff, which deprived him of his entitlement to priority over "off the street" applicants for subsequent job openings and had a deleterious effect on his retirement benefits. Thus, although many of the plaintiffs eventually were re-employed by Chrysler, because their re-employment took place outside of the recall window, they lost their seniority and the benefits attendant to that seniority.

As the plaintiffs' work opportunity rights arose from various agreements between Chrysler and UAW, disputes over those rights were subject to a contractually-specified grievance and arbitration process. That process consisted of multiple "steps" which ultimately culminated in binding arbitration if the dispute was not resolved between the parties.

Although rumors and disgruntlement regarding Chrysler's off-the-street hiring in Kokomo abounded among UAW members in the 1980s and 1990s, not until April 2002 did Local 371 challenge the hiring as a violation of Chrysler's contractual obligations. That month, the Local filed two grievances asserting that Chrysler had disregarded the work opportunity rights of its laid-off workers beginning in 1984, when it started to hire workers off the street at its Kokomo facilities. Not until

that time, the plaintiffs assert, did they realize that the hiring was contrary to the terms of the various letter agreements between Chrysler and UAW. But the belated filing of these grievances was apparently triggered (at least in part) by the success an individual union member had achieved the preceding month after complaining to his Congressman and the Department of Veterans Affairs. Ronnie Lough, like other members of Local 371, had been laid off from the New Castle plant in 1979. Lough later served in the Navy from 1982 until 1986. Upon his discharge, he sought re-employment with Chrysler and asked that his time in the armed services be recognized as a military leave of absence and that he be rehired by the company; but Lough was advised that there were still other workers with greater seniority in the queue ahead of him awaiting recall. Lough eventually was able to return to work at the New Castle facility, but by this time his recall window had closed and he had lost his seniority as a result. Lough complained to his Congressman about his loss of seniority, noting that Chrysler had been hiring people with lesser or no seniority both before and after his 1986 attempt at re-employment. His Congressman forwarded the complaint to Veterans Affairs. After the Veterans Employment and Training Services looked into the matter, Lough's original seniority date was reinstated as of March 12, 2002.

The two grievances filed on behalf of the plaintiffs were presented to Chrysler's labor relations representatives. Chrysler denied both grievances as untimely at the second step of the contractual grievance procedure. Local 371 appealed the grievances through step 4 and thence

to what is described as the Appeal Board Step of the process, where the two grievances were consolidated. At that stage of the grievance process, the duty fell to international union representative Paul "Pete" Cutway to investigate the grievances, discuss them with company representatives, and decide whether to pursue them further to arbitration. After looking into the grievances, Cutway decided to withdraw them for multiple reasons. First, Cutway believed that the grievances were untimely, given that violations of laid-off employees' work opportunity rights had been discussed among union members since the mid-1980s but no grievance had been filed until 2002. Cutway was aware of Lough's successful grievance and had suggested to Chrysler representatives that the belated restoration of Lough's seniority had "opened a can of worms"; but Cutway ultimately was persuaded by Chrysler's position that it was Lough's status as a veteran of the armed services, and not his layoff from the New Castle plant, that had triggered the restoration of his seniority. Second, Cutway believed that the grievances posed insurmountable problems of proof: he could find little or nothing in the way of a paper trail that would enable him to show that Chrysler had, in fact, violated the work opportunity rights of laid-off employees in hiring people more than 15 years earlier, and a number of key witnesses to the relevant events, including past presidents of Local 371, had either died or retired from the company. These circumstances persuaded Cutway that UAW was unlikely to prevail at arbitration, and for that reason the grievances were withdrawn "without precedent" as of January 10, 2003.

Pursuant to section 30(b) of the 1999 Master Agreement in effect at that time, grievances can be withdrawn either "without prejudice" or "without precedent." A grievance that is withdrawn without prejudice may be reinstated within three months of the withdrawal. A grievance withdrawn without precedent may not be reinstated (and so the withdrawal is *with* prejudice), but the withdrawal may not serve as binding precedent in another case.

Local 371 was advised of the withdrawal of the grievances by a letter dated February 4, 2003. That same day, when the grievances were discussed at a plant-wide meeting, General Holiefield, the administrative assistant to UAW's International Vice-President, told workers that the issue was "dead."

The decision to withdraw a grievance is one that can be appealed. Article 33 of the 2002 UAW Constitution provides that such an appeal may be initiated either by a local organization or by an individual union member. Indeed, Section 5 of Article 33 requires that such internal appeals be pursued before an aggrieved individual or local seeks relief outside of the union:

> It shall be the duty of any individual or body, if aggrieved by any action, decision or penalty imposed, to exhaust fully the individual or body's remedy and all appeals under this Constitution and the rules of this Union before going to a civil court or governmental agency for redress.

Where, as here, it is the decision of an international union representative that is being challenged, the route of appeal is first to the UAW's International Executive Board

(via the UAW International President) and then either to the Convention Appeals Committee (comprised of representatives from each of UAW's regions) or, where appropriate, to the Public Review Committee (comprised of independent union "outsiders"). Such an appeal must be commenced within thirty days of the decision being challenged.

Letter Agreement Number 7 between Chrysler and UAW, dated October 28, 1985, confirms that a grievance can be reinstated by means of such internal union appeals, even as the agreement acknowledges the parties' shared interest in finality:

> During negotiations of the National Production and Maintenance, Office and Clerical, Engineering and Parts Depot Agreements, the parties acknowledged the desirability of ensuring prompt, fair and final resolution of employee grievances. The parties also recognized that the maintenance of a stable, effective and dependable grievance procedure is necessary to implement the foregoing principle to which they both subscribe. Accordingly, the parties view any attempt to reinstate a grievance properly disposed of as contrary to the purpose for which the grievance procedure was established and violative of the fundamental principles of collective bargaining.

> However, in those instances where the International Union, UAW, by either its (i) Executive Board, (ii) Public Review Board, or (iii) Constitutional Convention Appeals Committee has reviewed the disposition of a grievance and found that such dis-

position was improperly effected by the Union or a Union representative involved, the UAW Chrysler Department may inform the Corporate Labor Relations Staff in writing that such grievance is reinstated in the grievance procedure at the step at which the original disposition of the grievance occurred.

This letter agreement thus serves to confirm that not only may a union local or one of its members appeal the withdrawal of a grievance as set forth in Article 33 of the UAW Constitution, but that such an appeal can result in the reinstatement of a grievance. In this sense, Letter Agreement Number 7 serves to qualify Section 30(b) of the 1999 Master Agreement by making clear that a grievance withdrawn without precedent can be reinstated through UAW's appellate process (if by no other means) when a reviewing body concludes that the decision to withdraw the grievance was in some respect inappropriate.

However, after the withdrawal of their grievances was announced, none of the plaintiffs filed an appeal within the thirty-day time period specified by Article 33. Instead, on February 18, 2003, many of the plaintiffs filed suit against Chrysler in federal court. Another group of plaintiffs filed a second, similar lawsuit against the company and the union three months later. An amended complaint in the second suit, which added three additional plaintiffs, brought the total number of plaintiffs to 223. The two suits were consolidated in the district court.

Ultimately, the district court entered summary judgment in favor of Chrysler. As the court noted, union members, before they may bring suit against their em-

ployer under section 301 of the LMRA for breach of a collective bargaining agreement, ordinarily are required to exhaust whatever private remedies are available to address their grievances, including intra-union remedies. 2007 WL 1266773, at *5 (citing *Clayton v. UAW*, 451 U.S. 679, 685, 101 S. Ct. 2088, 2093 (1981)). By failing to appeal UAW's decision to withdraw their grievances, the plaintiffs had not complied with this requirement. The court considered each of the three factors that the Supreme Court and this court have identified as relevant to whether the failure to exhaust may be excused: hostility of union officials that would render exhaustion futile, inadequacy of the internal appeal procedure to obtain reinstatement of the grievance or the full range of relief otherwise available under section 301, and whether pursuit of internal appeals would unduly delay a hearing on the merits of the plaintiff's complaint. *Id.* at *5-*6 (citing *Hammer v. UAW*, 178 F.3d 856, 858 (7th Cir. 1999)). No argument was made as to the possibility of undue delay, the third factor. Although one of the two groups of plaintiffs argued futility—relying on testimony that some of those rehired had been told by local and international union officials that they should be glad they got their jobs back, and on the statement of the international union representative at a union meeting that the issue was "dead" and should be pursued no further—the court found the limited evidence they submitted insufficient to raise a triable issue on that point. *Id.* at *6. "This minimal effort to support the contention of futility is not enough to begin to approach what is necessary to show that the internal appeal process was

poisoned to the point that any attempt to appeal would have been in vain." *Id.* And although all of the plaintiffs contended that an internal appeal could not have obtained the reinstatement of their grievances once they had been withdrawn without precedent—and therefore *with* prejudice—the court found that contention belied by the express terms of Letter Agreement 7, which in allowing the reinstatement of grievances via the appellate process drew no distinction between grievances withdrawn with prejudice and those withdrawn without prejudice. *Id.* at \*6-\*7 The plaintiffs did suggest in passing that union leaders had not apprised them of their right to appeal the withdrawal decision, but the court noted that union members are charged with knowledge of the contents of such freely available documents as a union's constitution. *Id.* at \*7. Accordingly, the court found that the plaintiffs' failure to exhaust their internal remedies was unexcused and that, consequently, they were foreclosed from seeking relief in federal court. *Id.*

## II.

Although the plaintiffs have named only Chrysler as a defendant, their lawsuits unavoidably implicate UAW and its decision to withdraw their grievances. A section 301 lawsuit is an exception to a national labor policy that favors private rather than judicial resolution of disputes arising under collective bargaining agreements. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53, 85 S. Ct. 614, 616-17 (1965). Litigation is therefore considered the last resort in resolving such disputes. *E.g., Vail v. Raybestos Prods. Co.*,

533 F.3d 904, 908 (7th Cir. 2008). Chrysler and UAW have contracted to resolve most of their disputes through a grievance and arbitration process. Union members must avail themselves of these dispute-resolution mechanisms before turning to the courts for relief. *Id.* "Otherwise, the judiciary may marshal its scare resources to resolve disputes that the parties could have resolved privately." *Id.* And had UAW taken the plaintiffs' grievances to arbitration, the plaintiffs and the company both would have been bound by the result subject only to extremely narrow judicial review. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164, 103 S. Ct. 2281, 2290 (1983); *e.g.*, *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 418 F.3d 762, 768 (7th Cir. 2005). In fact, however, UAW opted to drop the plaintiffs' grievances rather than take them to arbitration. It was that decision that opened the door to this suit. For *Vaca v. Sipes*, 386 U.S. 171, 185-87, 87 S. Ct. 903, 914-15 (1967), and its progeny recognize that a union owes a fiduciary duty to represent its members fairly; and when the union fails in that obligation and mishandles a member's grievance against his employer, the aggrieved union member is entitled to seek relief in federal court. *See DelCostello*, 462 U.S. at 164, 103 S. Ct. at 2290. This is what gives rise to the hybrid nature of a section 301/fair representation lawsuit: the plaintiff is claiming that the employer has violated the collective bargaining agreement, but he is pursuing that claim in a judicial rather than a private forum because he is also claiming that the union has breached its duty of fair representation vis-à-vis that claimed violation. *See ibid.* These two claims "are inex-

tricably interdependent." *Id.* at 164-65, 103 S. Ct. at 2291 (internal quotation marks and citations omitted). Whether the plaintiff has sued his employer, his union, or both, in order to recover from either of them he must prove that his union breached its fiduciary obligation *and* that his employer breached the collective bargaining agreement. *Id.* at 165, 103 S. Ct. at 2291.

A claim that a union has breached its duty to fairly represent one of its members presumes that the union has been given a complete opportunity to pursue that member's grievance. *See Republic Steel*, 379 U.S. at 652-53, 85 S. Ct. at 616. Generally speaking, a member will not be heard to complain in court that his union breached its duty of fair representation unless he has first presented his grievance to the union and, if rebuffed, exhausted any and all of the internal union appeals available to him—*so long as* such appeals could result either in granting him complete relief or in the reinstatement of his grievance. *Clayton*, 451 U.S. at 692-93, 101 S. Ct. at 2097. The qualification stems from the fact that intra-union remedies are the sole province of the union; they are designed to settle disputes between a union and its members. *See id.* at 695-96, 101 S. Ct. at 2098-99. As such, intra-union remedies are distinct from the mechanisms specified by a collective bargaining agreement for resolving disputes between the union and the employer, and requiring a union member to exhaust his internal union remedies before filing suit will not in all instances further the national interest in the private resolution of disputes arising from collective bargaining agreements. *Ibid.* That interest will not be served, for example, when

the exhaustion of intra-union remedies holds out no prospect of meaningful relief to the plaintiff. *Ibid.* However, the interest will be served when there is a reasonable possibility that a member's grievance may be resolved through available intra-union remedies, either by reinstating his grievance (and thus giving him another shot at relief through the grievance-arbitration procedure) or by directly granting him the relief he seeks. "In either case, exhaustion of internal remedies could result in final resolution of the employee's contractual grievance through private rather than judicial avenues." *Id.* at 692, 101 S. Ct. at 2097; *see also Miller v. General Motors Corp.*, 675 F.2d 146, 148 (7th Cir. 1982).

The decision whether to dismiss a section 301 suit for failure to exhaust internal union remedies is one committed to the district court's discretion. *E.g.*, *Arnold v. United Mine Workers of Am.*, 293 F.3d 977, 979 (7th Cir. 2002). Among the (non-exclusive) factors bearing on that decision are: (1) whether the union has manifested such hostility to the plaintiff's grievance as to render exhaustion of his internal appeal rights futile, (2) whether the internal union appeals procedures are inadequate either to reactivate the grievance or to result in complete relief to the plaintiff, and (3) whether demanding exhaustion would cause undue delay in the resolution of the plaintiff's complaint. *Clayton*, 451 U.S. at 689, 101 S. Ct. at 2095; *see also Hammer v. UAW, supra*, 178 F.3d at 858; *Fulk v. United Transp. Union*, 108 F.3d 113, 116 (7th Cir. 1997). The plaintiffs in this case have relied on the first and second of these factors, but not the third. We must consider whether the district court abused its dis-

cretion in concluding that neither factor excused the plaintiffs' failure to exhaust their union remedies before bringing suit. "A court abuses its discretion when it resolves a matter in a way that no reasonable jurist would, or when its decision strikes us as fundamentally wrong, arbitrary, or fanciful." *United States v. Paul*, 542 F.3d 596, 599 (7th Cir. 2008). But, keeping in mind that the district court resolved this case on summary judgment, we must also consider whether the evidentiary record reflects any material dispute as to the relevant facts that might require a trial, or whether the district court committed any legal error in evaluating those facts. Our review on those matters is, of course, de novo. *E.g. Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008).

To begin, there is no dispute that there were avenues of appeal open to the plaintiffs after international union representative Cutway made the decision to withdraw their grievances. Article 33 of the UAW constitution describes an appellate process for review of the decisions of international representatives, makes clear that such appeals may be taken either by a union local or by an individual union member, and allows thirty days for such an appeal to be taken. It is undisputed that the plaintiffs made no efforts to take such an appeal before they repaired to federal court. In short, they did not exhaust the appeals that were available to them to challenge Cutway's decision to withdraw their grievances.

Invoking the second of the three *Clayton* factors, however, the plaintiffs make two threshold arguments

which relate to the adequacy of the appellate process available to them. Each of these arguments has to do in one way or another with Letter Agreement 7, which reveals that a grievance withdrawn by a union official can be reinstated pursuant to the appellate process described in Article 33. The first of these is procedural: they contend that Chrysler brought Letter Agreement 7 to the district court's attention too late in the summary judgment briefing below. Because Chrysler did not cite Letter Agreement 7 until it filed its reply memorandum in support of its motion for summary judgment, the plaintiffs contend that they were deprived of the opportunity to respond to any argument based on that letter agreement and for that reason the district court should have ignored it. They go on to argue that an integration clause in the 1999 collective bargaining agreement precludes Chrysler from relying on any side agreement akin to Letter Agreement 7.

The procedural argument—that the plaintiffs were caught by surprise when Chrysler first cited Letter Agreement 7 in its reply memorandum—loses its force in the face of Rule 56.1(d) of the Southern District of Indiana's local rules. That rule gives a nonmovant seven days in which to file a surreply when the party seeking summary judgment has cited new evidence in its reply brief; leave of court is not required to file such a surreply. Thus, the plaintiffs were not deprived of the chance to respond to Letter Agreement 7. Indeed, they are silent as to why the opportunity to file a surreply was not sufficient to address Letter Agreement 7. And for what it is worth, our review of the record satisfies us that Chrysler's belated

citation of Letter Agreement Number 7 was a natural and reasonable response to what the plaintiffs had argued in their memorandum in opposition to the motion for summary judgment. *See Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 (7th Cir. 2008).[2]

Plaintiffs' invocation of the integration clause in the collective bargaining agreement poses a more intriguing

---

[2] Chrysler argued in its motion for summary judgment that pursuant to Article 33 of the UAW Constitution, there was an appeals procedure available to the plaintiffs to challenge the decision to withdraw their grievances; and the company cited Cutway's deposition testimony for the notion that a successful appeal could have reinstated their grievances at the step of the grievance procedure at which they had been withdrawn. R. 73 at 32. Cutway in turn had cited the collective bargaining agreement for the proposition that the plaintiffs' grievances could have been reactivated. Cutway Dep. 109. In response, the plaintiffs cited section 30(b) of the 1999 collective bargaining agreement, which states that "[i]f a grievance is withdrawn without precedent it may not be reinstated . . . ." R. 111 at 18-19. That argument is what prompted Chrysler to cite Letter Agreement 7 in its reply memorandum in support of its contention that the grievances could have been reinstated notwithstanding section 30(b) of the collective bargaining agreement. R. 119 at 11-12; R. 120 Ex. 8. We note that plaintiffs do not contend on appeal that section 30(b) either conflicts with or restricts the relief available under Letter Agreement 7. They argue only that the integration clause of the collective bargaining agreement effectively nullifies Letter Agreement 7 and consequently leaves section 30(b) unmodified, such that their grievances, withdrawn without precedent, could not have been reinstated. Plaintiffs' opening brief at 15.

challenge to Letter Agreement 7, but it is not one that we need to resolve. The integration clause (section 115 of the 1999 Master Agreement) was not cited to the district court below, and so we do not have the benefit of the district court's thinking on that question.[3] The appellate briefing on this point is less than complete: neither party has cited any authority on such clauses, let alone authority that would shed light on the reach or limits of such clauses vis-à-vis collective bargaining agreements that have been supplemented over long periods of time by many written side agreements. The patent irony of the plaintiffs' reliance on the integration clause is that their own claim depends upon the validity of such side agreements, for it was Letter Agreements 11, 64n, and 85n that expanded their work opportunity rights to include plants that were more than 50 miles away from the New Castle plant from which they had been laid off—including the Kokomo plants. Yet they do not acknowledge the inconsistency between this argument and their theory of the case, nor, again, do they cite any case law that would give us some guidance as to which letter agreements, if any, might be recognized. The failure to develop this argument in any meaningful way leads us to conclude that the plaintiffs have waived it. *See, e.g., Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008).

---

[3] Normally, arguments not raised in the district court in civil cases are waived. *E.g., Metzger v. Ill. State Police*, 519 F.3d 677, 681-82 (7th Cir. 2008). Chrysler itself has waived any such contention, however, by not making it here. *See, e.g., Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003).

Alternatively, the plaintiffs contend that even if they could have achieved the reinstatement of their grievances by appealing Cutway's decision to withdraw them, the appeals available to them were nonetheless inadequate because their grievances, if reinstated, could not have afforded them complete relief. They point out that Letter Agreement 7, while providing for the reinstatement of grievances, also provides that the company would not be liable for damages or back pay. They add that, in any event, nothing in either Letter Agreement 7 or elsewhere indicates that further pursuit of their grievances could have corrected the loss of seniority and other benefits that the plaintiffs suffered when their work opportunity rights were violated.

But the plaintiffs are mistaken in thinking that they need not exhaust internal union appeals that do not hold out the prospect of complete relief. Union members are not excused from exhausting the appeals available to them simply because they cannot obtain all of the relief they seek. *Clayton* expressly (and repeatedly) states that appeals which can result in *either* the reactivation of a grievance *or* the provision of full relief must ordinarily be exhausted. 451 U.S. at 685, 692, 695, 696, 101 S. Ct. at 2093, 2097, 2098, 2099. So long as intra-union appeals can result in the reinstatement of a grievance, such that a plaintiff can obtain whatever remedies are available within the negotiated process for revolving disputes, a union member retains the duty to exhaust such appeals before bringing suit. That was our express holding in the *Miller* decision more than twenty-five years ago. *Miller v. General Motors Corp.*, *supra*, 675 F.2d at 149. As we

have said, in view of the express terms of Letter Agreement 7, the plaintiffs' grievances could have been reinstated after Cutway decided to withdraw them by means of a successful internal appeal.

The plaintiffs' principal contention on appeal is that they were unaware of Letter Agreement 7 and thus had no idea that, contrary to section 30(b) of the collective bargaining agreement, they could obtain the reinstatement of their grievances by appealing Cutway's decision to withdraw them. They emphasize that Letter Agreement 7 was not among the agreements attached to the 1999 Master Agreement in effect at the time their grievances were withdrawn, so they were unaware of its existence, let alone its terms. Additionally, they aver as they did below that no union official ever apprised them that they had the right to appeal Cutway's decision to withdraw their grievance and, if successful, to reverse that decision.

But the general rule is that ignorance of one's internal union remedies does not excuse the failure to pursue such remedies before bringing suit, *Hammer v. UAW*, *supra*, 178 F.3d at 858-59; *Miller*, 675 F.2d at 149-50, and we cannot say that the district court acted improperly in applying that rule here. It is undisputed that Letter Agreement 7 was not one of the side agreements that was attached to the 1999 collective bargaining agreement and that the plaintiffs were not aware of this agreement. But our decisions in *Hammer*, 178 F.3d at 858-59, *Miller*, 675 F.2d at 149-50, and *Newgent v. Modine Mfg. Co.*, 495 F.2d 919, 927-28 (7th Cir. 1974), *overruled on other grounds by Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 690 n.3

(7th Cir. 1982), all state that union members have an obligation of diligence in ascertaining what avenues of relief are available to them within the union. *Newgent* explained that a union member must make himself aware of the remedies that are available to him even when he has been told by a union officer that nothing more can be done:

> By becoming a member of the [u]nion, Newgent was contractually obligated to exhaust union remedies before resorting to a court action. Necessarily implied in this obligation is the duty to become aware of the nature and availability of union remedies. Newgent was not justified in remaining in ignorance of the provisions governing his own union or, in fact, of relying on a statement by an officer that there was nothing he could do.

495 F.2d at 927-28 (internal quotation marks, footnote, and citations omitted). *Miller* held that an appeals process outlined in a side agreement similar to Letter Agreement 7, which was also described in a union newsletter, should have been known to union members. 675 F.2d at 150; *see also Lewis v. Local Union No. 100 of Laborers' Int'l Union of N.A.*, 750 F.2d 1368, 1381 (7th Cir. 1984) (union's failure to provide plaintiff with copies of union constitution and collective bargaining agreement did not excuse plaintiff from exhausting intra-union remedies); *Monroe v. UAW*, 723 F.2d 22, 25-26 (6th Cir. 1983) (per curiam) (rejecting plaintiff's argument that exhaustion was not required when he did not know his grievance could be reactivated because that provision was set forth in a

separate letter agreement of which he was unaware). The record in this case does not reveal how widely distributed Letter Agreement 7 was, if at all. Yet, there is no evidence that Letter Agreement 7, along with the other seventy or so agreements in the Book of Letters, was inaccessible to the plaintiffs had they sought it out. Chrysler has also represented, without contradiction, that Letter Agreement 7 had been in effect since 1985. Beyond averring that they were ignorant of Letter Agreement 7, the plaintiffs have presented no evidence suggesting that the agreement was unavailable to them and could not have been located in the exercise of diligence. We do know that within the thirty days the plaintiffs had to appeal Cutway's decision to withdraw their grievances, the plaintiffs were aware that such agreements existed. They attached several of these agreements, including Letter Agreements 11 and 85n, to the federal complaints they filed two weeks after Cutway decided to withdraw their grievances and while they still had more than two weeks left to file internal union appeals. Both complaints, in fact, acknowledged the existence of a collection of the letter agreements apart from those attached to the 1999 Master Agreement. *See* R. 15-2 at 5 ¶ 11, R. 15-3 at 8 ¶ 9.[4] No later than that time, then, the plaintiffs were on notice that there might be additional letter agreements relevant to their grievances. They have offered no ex-

---

[4] Indeed, the plaintiffs were likely aware of the Book of Letters earlier than this, as the grievances filed on their behalf by Local 371 in April of 2002 expressly referred to the Book of Letters. R. 15-2 at 26-27; R. 15-3 at 18-19.

planation for their failure to locate and familiarize them-
selves with those agreements, including in particular
Letter Agreement 7. We do not foreclose the possibility
that, on a different record, we might conclude that
union members should not be charged with knowledge
of a side agreement that was not freely available to them.
*Cf. Fulk*, 108 F.3d at 118 (exhaustion of union remedies
may be excused due to the complexity and ambiguity of
the procedural path, where plaintiff has made a reason-
able effort to exhaust). But all that the plaintiffs have
shown here is that they were unaware of Letter Agreement
7, not that they could not have discovered it through
diligent efforts to determine the remedies available to
them.

Plaintiffs fare no better with their resort to the first
*Clayton* factor—union hostility that would have ren-
dered pursuit of internal appeals futile. For that proposi-
tion, the plaintiffs rely on the statement by Holiefield,
the administrative assistant to the international union's
vice-president, that their grievances were a "dead issue"
and that no further action would be taken on their griev-
ances. Since the first route of appeal was to the interna-
tional union's executive board, Holiefield's statements
that the grievances were "dead" suggested to plaintiffs
that there was no point in pursuing them further. The
plaintiffs also point out that despite open discussions
of their grievances at union meetings, they received no
guidance from any UAW representatives as to the reme-
dies that remained for them to pursue. But as we stated
in *Hammer*, the hostility of union officials to a member's
grievance will demonstrate futility only when that

hostility "permeate[s] every step of the internal appeals process . . . ." 178 F.3d at 859 (citing *Sosbe v. Delco Elec's*, 830 F.2d 83, 86 (7th Cir. 1987)). As set forth above, the plaintiffs were entitled to appeal the decision to withdraw their grievances to three different bodies: the Executive Board, the Public Review Board, and the Constitutional Convention Appeals Committee. Holiefield was not a member of any of these bodies. Additionally, as Cutway testified in his deposition, the members of the Public Review Board are not employed by the international union and do not fall under the jurisdiction of the international union but rather operate independently of the union. So even if Holiefield's statement reflected the view of the international union as a whole, the plaintiffs have not shown why that hostility should be attributed to the Public Review Board, which had the authority to reinstate their grievances. *See Hammer*, 178 F.3d at 859 (noting the availability of "a final appeal to an independent panel, the Public Review Board" as sufficient to show internal appeals were not futile despite alleged hostility of union local). *Cf. LaPerriere v. UAW*, 348 F.3d 127, 131-32 (6th Cir. 2003) (exhaustion excused where both local and international unions expressed hostility to member's complaint). Moreover, we have repeatedly rejected statements akin to Holiefield's as sufficient to show pervasive hostility. *See Miller*, 675 F.2d at 150-51 (futility not shown where local union official who withdrew plaintiff's grievance told plaintiff that even if the grievance were reinstated on appeal, the official would simply withdraw it again); *Baldini v. Local Union No. 1095, UAW*, 581 F.2d 145, 148 (7th Cir. 1978) (futility not

shown despite international union official's remark to plaintiff that nothing more could be done for him), *overruled on other grounds by Rupe v. Spector Local Freight Sys., supra*, 679 F.2d at 690 n.3.

### III.

For all of these reasons, we conclude that the district court did not abuse its discretion in dismissing the plaintiffs' suit based on their failure to exhaust their internal remedies.

AFFIRMED.