*Amalgamated Transit Union, Local 1300 and David A. McClure v. William T. Lovelace, Jr.*, No. 25, September Term, 2014, Opinion by Adkins, J.

**LABOR LAW — EXHAUSTION OF INTERNAL UNION REMEDIES — DEFAMATION — MONETARY DAMAGES:** When a union member claims that his union and a fellow union member are liable for defaming him and seeks monetary damages, if the union's internal remedies do not provide monetary damages, they are inadequate and the union member is not required to exhaust them before filing suit in court.

Circuit Court for Baltimore City
Case No.:  24-C-10-006258
Argued:  November 10, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2014

AMALGAMATED TRANSIT UNION,
LOCAL 1300 AND DAVID A. MCCLURE

v.

WILLIAM T. LOVELACE, JR.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Adkins, J.
McDonald and Watts, JJ., concur.
Harrell, J., dissents.

Filed: February  4, 2015

Maryland law has long recognized the rule that a union member must exhaust the union's internal remedies before filing suit in court. *Walsh v. Commc'ns Workers of Am., Local 2336*, 259 Md. 608, 612, 271 A.2d 148, 150 (1970). If these procedures are procedurally or substantively inadequate, however, exhaustion is excused. *Id.* In this case, we consider whether union remedies are inadequate when they do not provide the monetary damages a union member[1] seeks when he sues his union and a fellow union member for defamation.

## FACTS AND LEGAL PROCEEDINGS

Respondent, William T. Lovelace, Jr., worked for the Maryland Transit Administration ("MTA") and was a member of Petitioner, Amalgamated Transit Union, Local 1300 ("Local 1300").[2] Lovelace and Petitioner, David McClure (collectively with Local 1300, "the Union"), served together as officers on Local 1300's Executive Board between 2007 and 2010—Lovelace as Financial Secretary, a position to which he was first elected in 2001, and McClure as President. During the three years they served together,

---

[1] We recognize that "union members" and "union officers" are often addressed as separate groups. *See, e.g.*, *Batson v. Shiflett*, 325 Md. 684, 712, 602 A.2d 1191, 1205 (1992) (discussing the dispute between the union member and union officers in *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977)). In this opinion, however, when we use the term "union members" we are referring to all those employees who are part of a union, regardless of whether they have been elected as officers.

[2] Local 1300 serves the Greater Baltimore region and is one of 264 local unions in 44 states and nine provinces of Canada that compose the Amalgamated Transit Union. *About Local 1300, History of Amalgamated Transportation Union*, A.T.U. Local 1300 Baltimore MD, http://atu-local1300.com/frameset1.htm (last visited Dec. 9, 2014). With approximately 190,000 members, the Amalgamated Transit Union, founded in 1892, is the largest labor organization representing transit workers in the United States and Canada. *Id.*

Lovelace and McClure often disagreed about Local 1300's financial matters, and became "political enemies." When both men ran for reelection in 2010, McClure prevailed, and Lovelace was defeated. Lovelace blamed his defeat on the allegedly false and defamatory statements that McClure made prior to and during the campaign.

Lovelace filed a defamation action in the Circuit Court for Baltimore City against the Union, seeking $1 million in compensatory damages and $3 million in punitive damages for his defeat in the 2010 election, reputational injury, pain and suffering, and emotional distress. He alleged that between 2007 and 2010, McClure, acting within the scope of his employment, published—to numerous Local 1300 members—false and defamatory statements accusing Lovelace of stealing from Local 1300 and misappropriating funds. Lovelace averred that in several instances, McClure specifically implored others not to reelect Lovelace because he was stealing from Local 1300. Lovelace alleged that McClure knew the defamatory statements were false or acted with reckless disregard as to whether they were false. Regarding Local 1300's vicarious liability, Lovelace alleged that it ratified McClure's statements because it had knowledge of the statements but failed to adequately investigate their truthfulness or stop them.

The Union filed Motions to Dismiss, asserting, in part, that Lovelace failed to exhaust Local 1300's internal remedies before filing suit. The Circuit Court denied the Motions, concluding that Lovelace was not required to exhaust Local 1300's remedies because without the availability of monetary damages, the remedies were inadequate as a matter of law.

2

The case was tried before a jury in April and May 2012. Several witnesses testified that McClure told them that Lovelace was stealing from Local 1300. Ultimately, the jury rendered a verdict in Lovelace's favor, finding that McClure defamed Lovelace with actual malice and that Local 1300 was vicariously liable for the defamation. The jury awarded $200,000 for injury to reputation, $60,000 for financial loss, and $75,000 for mental anguish. The jury also awarded punitive damages—$7,500 against McClure and $82,500 against Local 1300.

The Union appealed, contending, in part, that the trial court erred when it denied their Motions to Dismiss because Lovelace was required to exhaust Local 1300's internal remedies before filing suit. *See McClure v. Lovelace*, 214 Md. App. 716, 725, 78 A.3d 934, 939 (2013). Lovelace responded that he was not required to pursue these remedies because they were "procedurally and substantively inadequate." *Id.* In a reported opinion, the Court of Special Appeals affirmed the Circuit Court, concluding that Local 1300's internal remedies were inadequate because they could not provide the monetary damages Lovelace sought. *Id.* at 735, 78 A.3d at 945. The Union filed a Petition for Writ of Certiorari, which this Court granted on February 21, 2014, to answer the following question:

> Whether an internal union remedy is "inadequate," thus excusing a plaintiff from exhausting internal union procedures for resolving a dispute before seeking relief in court, if it does not provide the monetary damages the plaintiff seeks?

Because we answer yes, we shall affirm the judgment of the Court of Special Appeals.

3

**STANDARD OF REVIEW**

In reviewing the denial of a motion to dismiss, "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins.*, 306 Md. 754, 768, 511 A.2d 492, 500 (1986). The facts we may consider are limited "to the four corners of the complaint and its incorporated supporting exhibits, if any." *Converge Servs. Grp. v. Curran*, 383 Md. 462, 475, 860 A.2d 871, 879 (2004); *accord Nickens v. Mount Vernon Realty Grp.*, 429 Md. 53, 62, 54 A.3d 742, 748 (2012) ("Ordinarily, when a trial court purports to grant a motion to dismiss, we review that action based solely on the allegations contained within the four corners of the complaint . . . ."). Pursuant to Maryland Rule 2-322(c), however, "when a trial judge is presented with factual allegations beyond those contained in the complaint to support or oppose a motion to dismiss and the trial judge does not exclude such matters, then the motion shall be treated as one for summary judgment." *Nickens*, 429 Md. at 62–63, 54 A.3d at 748 (internal quotation mark and citation omitted); *see* Md. Rule 2-322(c); *see also Ray v. Mayor of Balt.*, 430 Md. 74, 91, 59 A.3d 545, 555 (2013) (treating motion to dismiss as motion for summary judgment because trial court considered materials outside the pleadings).

Here, Lovelace did not attach the Local 1300 Constitution to his Complaint or Amended Complaint as a supporting exhibit. The Union attached the Local 1300 Constitution to their Motions to Dismiss, and the Circuit Court judge considered it when denying the Motions. Therefore, we will treat the Motions to Dismiss as Motions for

4

Summary Judgment[3] and review the Circuit Court's denial of summary judgment as a matter of law.[4] *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202, 1206 (1990) ("[T]he standard for appellate review of a trial court's grant or denial of a motion for summary judgment is whether the trial court was legally correct.").

## DISCUSSION

The Union asserts that when the Court of Special Appeals concluded that the Union's internal remedies were inadequate, it "held, in effect, that an internal union remedy could be adequate *only* if it provided the *identical* form of relief that the litigant sought in the subsequent civil action." (Emphasis in original.) The Union contends that in order to

---

[3] Pursuant to Maryland Rule 2-322(c), a motion to dismiss may only be treated as one for summary judgment if all the parties are "given reasonable opportunity" to present all pertinent material. Here, because the contents of the Local 1300 Constitution are undisputed, both parties were given a reasonable opportunity to present all pertinent material.

[4] This Court has held that "a denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record[.]" *Metro. Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 29, 415 A.2d 582, 584 (1980). "[O]n appeal, absent clear abuse . . . the manner in which this discretion is exercised will not be disturbed." *Id.* Here, when the hearing judge ruled on the Union's Motions for Summary Judgment the factual record was complete with respect to the issue under consideration because the contents of the Local 1300 Constitution was undisputed. Therefore, the hearing judge did not exercise discretion to deny the Motions until there was a complete factual record, but rather only answered a pure legal question. Accordingly, the abuse of discretion standard does not apply and we will review the hearing court's pure legal determination as a matter of law.

5

be adequate, internal union remedies need not provide an identical remedy—they need only permit a union member to *avoid or mitigate* an injury.

Petitioners then argue that § 22.1 and § 14.8 of the Local 1300 Constitution are adequate remedies because they could have restored Lovelace's reputation within the union community and led to his reelection. Section 22.1 provides a mechanism for a Local 1300 member to be charged with and disciplined for misconduct:

> Any officer or member may be charged with specific activities involving: a violation of any specific provision of the Constitution and General Laws or the bylaws of the member's L[ocal] U[nion]; gross disloyalty or conduct unbecoming a member; malfeasance or nonfeasance in office; financial malpractice; corrupt or unethical practices or racketeering; dual unionism, decertification or secession; or a violation of duly established and applicable rules, regulations, policies or practices of a [Local Union.]

The charges are tried before a Local 1300 trial board. Any Local 1300 member charged under § 22.1 may be suspended from office, suspended or expelled from union membership, fined, declared ineligible for office, or otherwise disciplined. Petitioners assert that had Lovelace successfully pursued charges under § 22.1, the ensuing public trial would have cleared his name and vindicated his reputation, thereby permitting him to compete on a level playing field during the 2010 election.

Section 14.8 permits Local 1300 members to "challenge the conduct or results of an election." It does not limit the grounds upon which an election may be challenged. The Union contends that had Lovelace successfully contested the 2010 election on the grounds that it was tainted by McClure's defamatory statements, Local 1300 could have determined

6

that Lovelace had been unfairly slandered during the election campaign and ordered that the election be rerun.

Finally, the Union cautions that the conclusion of the Court of Special Appeals undermines the exhaustion requirement and the policies on which it rests—union self-government and judicial economy. Specifically, Petitioners argue that if union members could seek monetary damages in a civil suit without first pursuing internal union remedies that could have avoided or mitigated the injury, union members "would have a powerful incentive to skip the internal union procedures entirely."

In response, Lovelace urges us to affirm the Court of Special Appeals. He contends that § 22.1 and § 14.8 of the Local 1300 Constitution provide inadequate relief because by not providing monetary damages, they do not offer "complete relief" as required by the holding of the Supreme Court of the United States in *Clayton v. Int'l Union*, 451 U.S. 679, 101 S. Ct. 2088, 68 L. Ed. 2d 538 (1981).

### *Clayton* And *McPhetridge*

In the four decades since this Court decided *Walsh*, we have devoted very little, if any, attention to the question of what constitutes an "inadequate" internal union remedy. Because Congress codified the exhaustion requirement in the Labor Management

Reporting and Disclosure Act ("LMRDA"),[5] 29 U.S.C. § 411(a)(4) (2012),[6] the majority

of cases addressing the inadequacy of internal union remedies arise in federal courts.

Petitioners rely, almost exclusively, on two federal cases: (1) *Clayton*, *supra*; and

(2) *McPhetridge v. IBEW, Local Union No. 53*, 578 F.3d 886 (8th Cir. 2009).[7] They assert

---

[5] "The Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) provides standards for the reporting and disclosure of certain financial transactions and administrative practices of labor organizations and employers; the protection of union funds and assets; the administration of trusteeships by labor organizations; and the election of officers of labor organizations. The Act also guarantees certain rights to all union members." *The Labor-Management Reporting and Disclosure Act of 1959*, United States Department of Labor, http://www.dol.gov/compliance/laws/comp-lmrda.htm (last visited Dec. 9, 2014).

[6] 29 U.S.C. § 411(a)(4) (2012) protects the right of union members to sue their union but requires union members to exhaust internal union remedies before filing suit:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

[7] Petitioners also cite *Fabian v. Freight Drivers & Helpers Local No. 557*, 448 F. Supp. 835 (D. Md. 1978) and *Winter v. Local Union No. 639*, 569 F.2d 146 (D.C. Cir. 1977). In *Fabian*, the district court concluded that the union's "procedures are not rendered inadequate because of the unavailability of the money damages requested here by the plaintiffs." 448 F. Supp. at 839 (citation omitted). In *Winter*, the federal appellate court,

that "as *Clayton* makes clear, and as *McPhetridge* explicitly holds, an internal union procedure is not inadequate because of the unavailability of monetary damages if it offers a remedy that allows the union member to avoid or mitigate the injury for which monetary damages are sought in litigation."

We first consider *Clayton*, the seminal Supreme Court case addressing whether union members must exhaust internal union remedies. There, after being discharged from his employment due to alleged misbehavior, Clayton asked his union representative to file a grievance on his behalf. *Clayton*, 451 U.S. at 682, 101 S. Ct. at 2091–92, 68 L. Ed. 2d 538. The union pursued the grievance but ultimately abandoned it before arbitration. *Id.*, 101 S. Ct. at 2092, 68 L. Ed. 2d 538. Although the union's internal procedures permitted him to appeal the decision not to pursue arbitration, Clayton, instead, filed suit in federal district court under § 301(a) of the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a).[8] *Id.* at 683, 101 S. Ct. at 2092, 68 L. Ed. 2d 538. Alleging that the union breached

acknowledging that "Winter probably could not have obtained money damages through union disciplinary channels," nevertheless held that exhaustion was required because "Winter could . . . have obtained some of what he seeks, . . . an injunction, by a favorable outcome in the union proceedings." 569 F.2d at 149. These two cases, however, were decided before *Clayton v. Int'l Union*, 451 U.S. 679, 101 S. Ct. 2088, 68 L. Ed. 2d 538 (1981). Because *Clayton* created a new test for whether an internal union remedy is inadequate, *Fabian* and *Winter* are not persuasive.

[8] The Labor Management Relations Act, 1947, § 301(a), 29 U.S.C. § 185(a) (2012), provides the basis for a union member's right to sue the employer for a violation of the collective bargaining agreement and grants federal courts jurisdiction to enforce collective bargaining agreements:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court

its duty of fair representation and the employer breached the collective-bargaining agreement by terminating him without just cause, *id.*, 101 S. Ct. at 2092, 68 L. Ed. 2d 538, he sought reinstatement from the employer and monetary damages from both the employer and the union, *id.* at 690, 101 S. Ct. at 2096, 68 L. Ed. 2d 538. As an affirmative defense, the employer and the union pleaded failure to exhaust the union's internal appeals procedures. *Id.* at 683, 101 S. Ct. at 2092, 68 L. Ed. 2d 538. The federal district court sustained this defense and dismissed the suit, concluding that the internal appeals procedures were adequate as a matter of law and Clayton had failed to exhaust them. *Id.* at 683–84, 101 S. Ct. at 2092, 68 L. Ed. 2d 538.

Following an appeal to the United States Court of Appeals for the Ninth Circuit, the Supreme Court granted *certiorari* to resolve the issue of when a union member is required to exhaust internal union remedies before filing suit. *Id.* at 685, 101 S. Ct. at 2093, 68 L. Ed. 2d 538. The Court declined to impose a universal exhaustion requirement, instead outlining three factors a court should consider when deciding whether to require exhaustion:

> [F]irst, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; *second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301*; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

---

> of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

10

*Id.* at 689, 101 S. Ct. at 2095, 68 L. Ed. 2d 538 (emphasis added). If any of these factors exists, "a court may properly excuse the employee's failure to exhaust." *Id.* The Court applied the second factor (the "*Clayton* inadequacy test"), holding that "where an internal union appeals procedure cannot result in reactivation of the employee's grievance or an award of the complete relief sought in his § 301 suit, exhaustion will not be required with respect to either the suit against the employer or the suit against the union." *Id.* at 685, 101 S. Ct. at 2093, 68 L. Ed. 2d 538. Although the union's internal appeals procedures could provide "at least some monetary relief," the Court observed that "the union can neither reinstate Clayton in his job . . . nor reactivate his grievance." *Id.* at 691, 101 S. Ct. at 2096, 68 L. Ed. 2d 538. Consequently, the Court held that the union's internal appeals procedures were inadequate and Clayton was not required to exhaust them before suing the union or the employer. *Id.* at 696, 101 S. Ct. at 2099, 68 L. Ed. 2d 538.

Without disputing that Lovelace never pursued a grievance, Petitioners nevertheless focus on the first part of the *Clayton* inadequacy test and equate reactivating a grievance[9]

---

[9] Many collective bargaining agreements between labor unions and employers provide that employees who are union members may only be terminated for just cause. *See, e.g.*, *Childers v. Chesapeake & Potomac Tel. Co.*, 881 F.2d 1259, 1260 (4th Cir. 1989) ("The terms and conditions of [the union member's] employment with [the employer] were governed by a collective bargaining agreement between [the employer] and the union, which prohibited termination of employees without 'just cause' . . . ."). In many instances, when a union member believes that he has been terminated without just cause, he will ask his union to file a grievance with the employer on his behalf. *See, e.g.*, *Clayton*, 451 U.S. at 682, 101 S. Ct. at 2091–92, 68 L. Ed. 2d 538. Collective bargaining agreements often outline a multi-step process for pursuing and resolving grievances, with the final step being arbitration. *See, e.g.*, *Vaca v. Sipes*, 386 U.S. 171, 175 n.3, 87 S. Ct. 903, 909 n.3, 17 L. Ed. 2d 842 (1967) (discussing the collective bargaining agreement's five-step procedure for handling grievances). If the union elects not to pursue arbitration of the grievance or abandons the grievance at one of the earlier steps in the process, the member can sue his

11

with avoiding or mitigating an injury. Specifically, Petitioners argue that reactivating a

union member's grievance avoids or mitigates the member's damages by restoring the

member to the situation he would have been in had the union not abandoned the grievance.

Relying on this premise, they ask us to read *Clayton* broadly, contending that it

> stands squarely for the proposition that, to be adequate, an
> internal union remedy need not necessarily provide for money
> damages, even if that is what the plaintiff seeks from the
> judicial forum, as long as the union's procedures—if
> successfully pursued—would permit the member to *avoid or
> mitigate the injury* for which damages are sought in court.

(Emphasis added.)

We decline, however, to read *Clayton* so broadly. Most of the federal cases that

have cited *Clayton* have not utilized the standard of "avoiding or mitigating" an injury to

measure what is an adequate remedy. *See, e.g., Bell v. DaimlerChrysler Corp.*, 547 F.3d

796, 807 (7th Cir. 2008) (measuring what is an adequate remedy based on whether the

union can reactivate a grievance or award complete relief); *Bassett v. Local Union No. 705*,

773 F.2d 932, 937 (7th Cir. 1985) (same); *Scoggins v. Boeing Co.*, 742 F.2d 1225, 1230

---

union for breach of the duty of fair representation. *See Clayton*, 451 U.S. at 683, 101 S.
Ct. at 2092, 68 L. Ed. 2d 538. When a member sues his union under this cause of action,
one of the remedies the union can provide is reactivating the member's grievance. A
member's grievance is "reactivated" when it is reinstated in the grievance procedure at the
step at which the union abandoned the original grievance. *See Nanney v. Chrysler Corp.*,
600 F. Supp. 1248, 1253 n.5 (D. Del. 1984) (stating that "a reactivated grievance is
reinstated in the grievance procedure at the step at which the original disposition of the
grievance occurred" (internal quotation marks omitted)); *see also Bassett v. Local Union
No. 705*, 773 F.2d 932, 936 (7th Cir. 1985) ("The [Supreme] Court's discussion of
reactivation in *Clayton* is directed exclusively to the situation where a union can resubmit
the plaintiff's grievance to some kind of collectively bargained dispute-resolution
procedures." (citation and internal quotation marks omitted)).

(9th Cir. 1984) (same)*; Keiper v. United Auto. Workers' Union, Local 677*, 867 F. Supp. 298, 302 (E.D. Pa. 1994) (measuring what is an adequate remedy based on whether the union can reactivate a grievance); *Williams v. United Auto Workers Local 501, AFL-CIO*, 841 F. Supp. 499, 504 (W.D.N.Y. 1993) (measuring what is an adequate remedy based on whether the union can reactivate a grievance or award complete relief); *Nanney v. Chrysler Corp.*, 600 F. Supp. 1248, 1254 (D. Del. 1984) (measuring what is an adequate remedy based on whether the union can reactivate a grievance). Likewise, at least two of our sister states have applied the *Clayton* inadequacy test, and neither of them have utilized that standard. *See Murad v. Prof'l & Admin. Union Local 1979*, 239 Mich. App. 538, 546, 609 N.W.2d 588, 592–93 (2000) (measuring what is an adequate remedy based on whether the union can reactivate a grievance or award complete relief); *Swieton v. City of Chi.*, 129 Ill. App. 3d 379, 384–85, 472 N.E.2d 503, 507 (1984) (measuring what is an adequate remedy based on whether the union can award complete relief).

We now turn to *McPhetridge,* Petitioners' primary authority. There, the union charged three members with working for a non-union contractor. *McPhetridge*, 578 F.3d at 888. The union notified the members that the union trial board would conduct a hearing to consider the charges. *Id.* The members did not attend the hearing. *Id.* After the trial board upheld the charges and fined the members $5,000 each, the union notified the members of the trial board's decision and advised them that under the union constitution, they could appeal the decision within forty-five days. *Id.* Instead of appealing, however, the members filed suit in federal court, alleging, in part, that the union violated the LMRDA

13

by denying their due process rights during the disciplinary proceedings.[10]  *Id.* at 889.  The United States District Court for the District of Missouri dismissed the free speech claim on the merits and dismissed the due process claim because the members did not exhaust the union's internal remedies.  *Id.*

On appeal, the United States Court of Appeals for the Eighth Circuit reviewed the district court's decision to require exhaustion.  The members argued that their failure to exhaust should be excused because the union's internal remedies could not provide them complete relief, specifically, the monetary damages they sought in their suit.  *Id.* at 891.  The court disagreed, concluding that

> had [the members] attended the Trial Board hearing and successfully raised the substantive and procedural issues now urged in this lawsuit, they would have avoided all injury.  Moreover, successful appeals of the Trial Board's adverse decisions would have abated the fines and relieved Plaintiffs of most or all the mental anguish, attorneys fees, and forced resignations now claimed as compensatory damages.

*Id.*  The court affirmed the district court's dismissal of the due process claims, ruling that the members were required to exhaust the union's internal remedies.

*McPhetridge* explicitly addressed the issue of avoiding or mitigating an injury.  We agree with the Union that *McPhetridge* required the union members to exhaust the union's

---

[10] 29 U.S.C. § 411(a)(5) (2012) outlines the due process rights of union members:
> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

14

internal remedies, and used Petitioners' standard—whether those remedies could have "avoided or mitigated" the injuries claimed by the members.[11] Nevertheless, as we explain below, *McPhetridge* does not carry the day for the Union.

First, *McPhetridge* is an outlier—it is the only federal case Petitioners cite (and we have found no others), in which a federal court analyzing whether internal union remedies were inadequate under *Clayton* addressed whether the remedies could "avoid or mitigate" damages. In all the other federal cases we have reviewed, the courts applied the *Clayton* inadequacy test to ascertain whether the unions' internal remedies could reactivate a grievance or provide complete relief. *See, e.g.*, *Bell*, 547 F.3d at 807 ("*Clayton* expressly (and repeatedly) states that appeals which can result in *either* the reactivation of a grievance *or* the provision of full relief must ordinarily be exhausted." (emphasis in original)); *Hammer v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 178 F.3d 856, 859 (7th Cir. 1999) ("[The union's] internal procedures could ultimately have resulted in both money damages and the reinstatement of Hammer's grievance—complete relief and more."); *Rogers v. Bd. of Educ. of Buena Vista Sch.*, 2 F.3d 163, 167 (6th Cir. 1993) (holding that the district court properly dismissed the plaintiff's complaint for failure to exhaust his internal union remedies because, although plaintiff's grievance could not be reactivated, the union could award all the money damages the plaintiff sought); *Bassett*, 773 F.2d at 937 ("Because [the union's] remedies were inadequate either to provide plaintiffs complete relief . . . or to reactivate [the union member's] grievance . . . we must

---

[11] These injuries originated from the fines the union ordered the members to pay.

hold that plaintiffs were not required to exhaust these remedies . . . ."); *Hayes v. Bhd. of Ry. & Airline Clerks*, 727 F.2d 1383, 1386 (5th Cir. 1984) (requiring exhaustion because "while it is clear that the internal union appeals procedures would have been inadequate to award [the union member] the full relief he seeks in this suit, that is, compensatory and punitive damages," the union member's "basic grievances could have been reactivated in the arbitration process."); *Curry v. Ford Motor Co.*, 646 F. Supp. 261, 264 (W.D. Ky. 1983) (granting summary judgment in favor of defendants because the union member "not only could obtain reactivation of his grievance, but could appeal within the UAW appeals process for rei[m]bursement of his lost wages for the time the grievance was withdrawn[.]"); *Mabane v. Metal Masters Food Serv. Equip. Co.*, 541 F. Supp. 981, 987 n.10 (D. Md. 1982) (concluding exhaustion would not be required because the union had no internal remedies that could reactivate the employees' grievances or award them complete relief). Thus, federal case law provides no basis for endorsing the *McPhetridge* court's analysis.

Second, the facts of *McPhetridge* are distinguishable from this case. Local 1300's internal procedures could not have avoided all the damages Lovelace suffered and it is uncertain whether they could have mitigated his damages.

In *McPhetridge*, if the union members had prevailed before the trial board, the union would not have imposed the fines. Here, there is no Local 1300 procedure that could have prevented McClure from making the false and defamatory statements about Lovelace.

16

Also, the jury found that McClure defamed Lovelace with actual malice[12]. When a plaintiff proves, by clear and convincing evidence, that he was defamed with actual malice, **damages are presumed**. *See Jacron Sales Co. v. Sindorf*, 276 Md. 580, 601, 350 A.2d 688, 700 (1976) (concluding that a plaintiff cannot recover presumed damages unless he establishes actual malice); *see also Samuels v. Tschechtelin*, 135 Md. App. 483, 549–50, 763 A.2d 209, 245 (2000) (stating that "damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof of harm"). Therefore, no Local 1300 procedure could have adequately avoided or compensated for all of Lovelace's damages because once he proved actual malice, the jury was justified in awarding damages without further proof of loss.

Additionally, in *McPhetridge*, it was certain that the union could mitigate the members' damages because the union had the authority to revoke the fines it had imposed. Here, while there is a possibility that pursuing § 22.1 and § 14.8 of the Local 1300 Constitution might have mitigated some of Lovelace's damages, any mitigation is uncertain and speculative. Petitioners argue that had Lovelace successfully brought charges against McClure under § 22.1 and challenged the 2010 election under § 14.8, his reputation within the union community might have been restored and he might have won reelection. This argument consists of several layers of speculation—it assumes that a

---

[12] "'Actual malice,' sometimes referred to as constitutional malice, is established by clear and convincing evidence that a statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Batson*, 325 Md. at 728, 602 A.2d at 1213 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 725–26, 11 L. Ed. 2d 686, 706 (1964)).

17

sufficient number of union members would learn about the outcome of the union trial, change their opinions about Lovelace, and change their votes to reelect him. Although the Union can control whether an election is rerun, the Union ultimately has no control over Lovelace's reputation, either within the union community or without. Nor could it control the results of a new election. Also, the record does not reveal any mechanism in the Local 1300 Constitution for informing all of the union's membership about the results of a union trial. Thus, unlike *McPhetridge*, it is uncertain whether Local 1300's internal remedies would have mitigated any of the damages Lovelace claimed.

### Applying The *Clayton* Inadequacy Test

In the state and federal cases cited, *supra*, the courts applied the *Clayton* inadequacy test when determining whether exhaustion is required in suits claiming breach of the duty of fair representation. Although Lovelace, unlike Clayton, did not sue for breach of the duty of fair representation, we will apply the *Clayton* inadequacy test to this case because Maryland shares one of the major policy objectives influencing the Supreme Court's analysis in *Clayton*—encouraging private resolution of disputes.

The *Clayton* Court reasoned that "where internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes." *Clayton*, 451 U.S. at 692, 101 S. Ct. at 2097, 68 L. Ed. 2d 538. Maryland's support for arbitration demonstrates that it is also concerned with encouraging the private resolution of disputes. *See Shailendra Kumar, P.A. v. Dhanda*, 426 Md. 185, 208, 43 A.3d 1029, 1042 (2012) ("There is no doubt that arbitration is favored and

18

encouraged in Maryland because it provides an informal, expeditious, and inexpensive alternative to conventional litigation." (citation and internal quotation marks omitted)); *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 152, 835 A.2d 656, 664 (2003) ("Maryland's Arbitration Act expresses the legislative policy favoring enforcement of agreements to arbitrate." (citation and internal quotation marks omitted)). The *Clayton* inadequacy test encourages the private resolution of disputes because, when internal union remedies reactivate a member's grievance or provide complete relief, there is no need for the member to seek judicial resolution of his dispute.

Here, the first part of the *Clayton* inadequacy test does not apply because Lovelace did not pursue a grievance. Therefore, we look to the second part of the test: whether Local 1300's remedies provide complete relief. Numerous federal courts applying the *Clayton* inadequacy test have concluded that internal union remedies do not offer complete relief if they do not provide monetary damages. *See, e.g.*, *Maddalone v. Local 17, United Bhd. of Carpenters of Am.*, 152 F.3d 178, 187 (2d Cir. 1998) (excusing exhaustion where the union failed to show that it could have paid the compensatory or punitive damages that the union member sought); *Achilli v. John J. Nissen Baking Co.*, 989 F.2d 561, 564 (1st Cir. 1993) (excusing exhaustion where the union failed "to demonstrate the existence of an internal remedy that might have given [the union member] the damages he seeks"); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1183 (9th Cir. 1988) (excusing exhaustion where the union failed to show that it could award monetary damages); *Cantrell v. Int'l Bhd. of Elec. Workers, Local 2021*, 860 F. Supp. 783, 786 (W.D. Okla. 1991) (excusing exhaustion where the union failed to show that the union member could have received back pay or a

19

monetary assessment), *aff'd*, 32 F.3d 465 (10th Cir. 1994); *cf. Chapman v. UAW Local 1005*, 670 F.3d 677, 685–86 (6th Cir. 2012) (requiring exhaustion where the union's Preliminary Review Board had the authority to require the union to pay money damages, back pay, or both), *cert. denied*, 133 S. Ct. 438, 184 L. Ed. 2d 260 (2012); *Rogers*, 2 F.3d at 167 (requiring exhaustion where the union's internal procedures provided monetary damages); *Tinsley v. UPS*, 665 F.2d 778, 780 (7th Cir. 1981) (same); *Murman v. Renold Power Transmission Corp.*, 632 F. Supp. 853, 857 (M.D. Pa. 1985) ("[T]he [u]nion would have been able to afford plaintiff complete relief since [it] has the power to grant monetary damages.").

Lovelace sought compensatory and punitive damages for his defeat in the 2010 election, reputational injury, pain and suffering, and emotional distress. Neither § 22.1 nor § 14.8 of the Local 1300 Constitution, however, provide monetary damages. Thus, we conclude that Local 1300's internal remedies were inadequate and Lovelace was not required to exhaust them.

## CONCLUSION

In conclusion, we hold that when a union member claims that his union and a fellow union member are liable for defaming him and seeks monetary damages, if the union's internal remedies do not provide monetary damages, they are inadequate and the union member is not required to exhaust them. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.**

20

**COSTS TO BE PAID BY PETITIONERS.**

Circuit Court for Baltimore City
Case No. 24-C-10-006258

Argued: November 10, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2014

_____

AMALGAMATED TRANSIT UNION,
LOCAL 1300 AND DAVID A. MCCLURE

v.

WILLIAM T. LOVELACE, JR.

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Concurring Opinion by Watts, J., which
McDonald, J., joins

_____

Filed: February 4, 2015

Respectfully, I concur. I would affirm the judgment of the Court of Special Appeals and hold that William T. Lovelace, Jr.'s ("Lovelace"), Respondent's, tort claim for defamation with actual malice sought monetary damages that Amalgamated Transit Union, Local 1300 ("Local 1300"), Petitioner, could not provide[1] as Local 1300 lacked a sufficient internal remedy to process and adjudicate such a claim; therefore, Lovelace was not required to exhaust internal union remedies. The Majority recognizes that the defamation claim is different from claims that are anticipated by Local 1300's constitution, but does not expand upon the idea or append the distinction to its holding. See Maj. Slip Op. at 17. I would.

Lovelace's claim could have arisen in any employment context, but simply happened to arise within the union election context. Nothing within Local 1300's constitution provided for the handling and resolution of the type of claim brought by Lovelace—a tort claim for defamation. Section 22 of Local 1300's constitution, entitled "Charges, Trials and Penalties," sets forth the union's "chargeable offense" procedure through which a union member can prefer charges against another union member or officer for various offenses, including "conduct unbecoming a member" and "financial malpractice." If charges are preferred against a union member or officer, the charges may thereafter be referred to the Executive Board or a trial committee for investigation and trial. If charges are sustained against a union member or officer, that member or officer "may be

---

[1]I agree with the Majority that, where a union member claims that he has been defamed by the union and a fellow union member "and seeks monetary damages, if the union's internal remedies do not provide monetary damages, they are inadequate and the union member is not required to exhaust them." Maj. Slip Op. at 20.

subjected to discipline and penalty in accordance with the applicable provisions of" Local 1300's constitution. Possible discipline includes suspension from office, suspension or expulsion from the union, fines, a declaration that the offender is ineligible to hold office, or "other[] discipline[.]" In addition, Section 14 of Local 1300's constitution, concerning election of local union officers, provides a procedure for challenging the results of an election, stating: "Any member who is entitled to vote may challenge the conduct or results of an election by filing, within ten (10) days of the counting of the ballots, a challenge to the incumbent [Secretary-Treasurer] of his or her [Local Union] to such effect."

In short, even if Lovelace had brought his defamation claim under Local 1300's constitution, it is unclear whether Local 1300 would have been equipped to process and resolve the matter under either Section 22 or Section 14, let alone award monetary damages. The Majority is in accord but does not make this obvious distinction a part of its holding. See Maj. Slip Op. at 17. Specifically, the Majority states that, "while there is a possibility that pursuing § 22.1 and § 14.8 of the Local 1300 Constitution might have mitigated some of Lovelace's damages, any mitigation is uncertain and speculative." Maj. Slip Op. at 17. The Majority notes that Local 1300 "has no control over Lovelace's reputation, either within the union community or without. Nor could it control the results of a new election. Also, the record does not reveal any mechanism in the Local 1300 Constitution for informing all of the union's membership about the results of a union trial." Maj. Slip Op. at 18. Stated otherwise, Local 1300's constitution did not provide a mechanism by which the union could adjudicate and provide complete relief to Lovelace, even absent Local 1300's inability to provide the monetary damages that were sought.

Where, as here, a tort claim for defamation with actual malice seeking monetary damages is at issue, a trial court—not a union trial board—is best positioned to adjudicate the tort claim. Defamation is a common law tort, and "to present a prima facie case for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third party; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." Gohari v. Darvish, 363 Md. 42, 54, 767 A.2d 321, 327 (2001) (citations and paragraph break omitted). The first element involves "publication," and the fourth element involves "special harm." See Restatement (Second) of Torts, § 558 (1977). These elements are technical legal concepts that courts have applied and developed through the case law for decades. Moreover, as an officer of Local 1300, Lovelace was a public figure, and thus had to prove actual malice, yet another technical legal concept. See Chesapeake Publ'g Corp. v. Williams, 339 Md. 285, 297, 661 A.2d 1169, 1175 (1995) ("[F]or a person to be held liable for defaming a public figure, actual or constitutional malice must be shown. Proving actual malice requires clear and convincing evidence that a statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." (Citations and internal quotation marks omitted)). Trial courts routinely address these legal concepts in resolving tort claims for defamation; a union's trial board is unlikely to ever be called upon to resolve defamation claims, especially if they are unrelated to a labor dispute.

In sum, I would hold that, under the circumstances of this case, Lovelace was not required to exhaust Local 1300's internal remedies—not only due to the unavailability of monetary damages, but also due to the lack of an internal union remedy sufficient to process

and adjudicate such a claim.

For the above reasons, respectfully, I concur.

Judge McDonald has authorized me to state that he joins in this opinion.

Circuit Court for Baltimore City
Case No. 24-C-10-006258
Argued: November 10, 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 25

September Term, 2014

AMALGAMATED TRANSIT UNION,
LOCAL 1300 and DAVID A. McCLURE

v.

WILLIAM T. LOVELACE, JR.

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Dissenting Opinion by Harrell, J.

Filed: February 4, 2015

I dissent. I do so because the Majority opinion fails to persuade me that adoption by Maryland of the "*Clayton* inadequacy test" announced in *Clayton v. Int'l Union*, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095 (1981) (quoted in Maj. Slip. Op. at 10), fits comfortably the circumstances of the present case. First, the *Clayton* inadequacy test for exceptions from the general exhaustion requirement is limited explicitly to claims under § 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a) (2012), for "violation[s] of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . , or between any such labor organizations." *See* Maj. Slip. Op. at 9–10 n.8. The present case does not fit within the universe of claims for which the *Clayton* test was devised. Second, the application of the rule announced in the Majority opinion would allow a plaintiff to avail him or herself of the *Clayton* test exceptions to skirt the exhaustion requirement merely by including in the complaint a prayer for monetary relief and allegations that the relevant labor organization's procedures do not authorize a remedy that contemplates the direct award of money damages or restitution.[1]

---

[1] The Majority opinion, in its efforts to singularize the present case, conflates pleading and proof, an obfuscation that will allow a plaintiff to avoid the exhaustion requirement through mere pleading, without proof. Maj. Slip. Op. at 16–17. The Majority opinion holds "that when a union member *claims* that his union and a fellow union member are liable for defaming him and seeks monetary damages, if the union's internal remedies do not provide monetary damages, they are inadequate and the union member is not required to exhaust them." Maj. Slip. Op. at 20 (emphasis added). This suggests that Lovelace need only have pleaded the magic words in order to skate safely past the obstacle of exhaustion. Yet in attempting to explain why Maryland should adopt a bastardized version of the *Clayton* test,

I find greater comfort in deciding the present case by analogy to Maryland administrative law explicating how Maryland courts resolve issues of primary and concurrent jurisdiction regarding maintenance of a proceeding before an administrative agency and pursuit of judicial action. On this score, *Converge Services Group, LLC v. Curran*, 383 Md. 462, 860 A.2d 871 (2004), is instructive. In *Converge*, we held that, where the courts and an administrative agency have concurrent jurisdiction over a claim, the claim should first run its course through the appropriate administrative scheme before court action may be appropriate. *Converge*, 383 Md. at 482–86, 860 A.2d at 883–85. Even

---

*see Clayton v. Int'l Union*, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095 (1981), the Majority opinion suggests:

> Here, there is no Local 1300 procedure that could have prevented McClure from making the false and defamatory statements about Lovelace. Also, the jury found that McClure defamed Lovelace with actual malice. When a plaintiff proves, by clear and convincing evidence, that he was defamed with actual malice, **damages are presumed**. Therefore, no Local 1300 procedure could have adequately avoided or compensated for all of Lovelace's damages because once he proved actual malice, the jury was justified in awarding damages without further proof of loss.

Maj. Slip. Op. at 16–17 (emphasis in original) (footnote omitted) (citations omitted). The Majority opinion puts the cart before the horse by referencing the legal principle that defamation damages are presumed once—and only if—the plaintiff demonstrates successfully at trial that he was defamed with actual malice. *Id.* The Majority opinion seeks to bolster this premise by citation to a case, *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 601, 350 A.2d 688, 700 (1976), that bears on the elements of proof at trial where the same measure of damages are presumed if a plaintiff proves defamation with actual malice. Maj. Slip. Op. at 16–17. Because the Majority cannot make up its mind whether the rule it announces is one of pleading sufficiency or proof sufficiency, I conclude that my reliance on the comparative clarity of our State administrative law principles discussed *infra* is preferable.

though the claims in *Converge* implicated areas of law in which the relevant agency had no statutorily-recognized expertise, we concluded that a claim should still run its course through the administrative procedures before judicial oversight may be appropriate. *Converge*, 383 Md. at 486, 860 A.2d at 885. Reasoning from these circumstances by analogy, Lovelace should have exhausted the remedies available to him through the constitution of Amalgamated Transit Union, Local 1300 ("the Union") before bringing in court his defamation action, even though the Union may not have expertise in defamation law per se and could not award directly monetary relief.

The dispute in *Converge* was between Converge Services Group, LLC, d/b/a SureDeposit, Inc. ("SureDeposit"), and the Consumer Protection Division of the Office of the Maryland Attorney General ("the Division"). *Converge*, 383 Md. at 466, 860 A.2d at 873. After SureDeposit began marketing and selling "surety bond product[s]" to Maryland residential real estate tenants to be used by those tenants in lieu of traditional security deposits, the Division commenced an investigation. *Id.* The Division believed that SureDeposit's trade practices violated the Maryland Consumer Protection Act, Md. Code (1975, 2000 Repl. Vol.), §§ 13-101, *et seq.*, of the Commercial Law Article ("CPA"), and the Maryland Security Deposit Law and Application Fee Law, Md. Code (1974, 2003 Repl. Vol.), §§ 8-203 and 8-213 of the Real Property Article (collectively, "SDL"). *Id.* Unsatisfied by the course of negotiations with the Division, and anticipating a potential contested administrative process regarding the Division's probable filing of administrative charges, SureDeposit filed pre-emptively a complaint in the Circuit Court for Baltimore County seeking declaratory relief that the SDL did not apply to SureDeposit's "surety bond

3

product" and, assuming that relief was granted, that SureDeposit had not violated the CPA. *Id.*; *see Converge*, 383 Md. at 470–71, 860 A.2d at 876. Very shortly thereafter, the Division filed an administrative statement of charges against SureDeposit, alleging multiple violations of the SDL and CPA. *Id.*

The actions proceeded briefly on parallel tracks. *Converge*, 383 Md. at 471, 860 A.2d at 876. The Division moved eventually for dismissal of the complaint in the Circuit Court action arguing, *inter alia*, that the Division, as an administrative agency with recognized expertise with regard to administering and interpreting the CPA, exercised primary jurisdiction over the entire dispute because the dispute included an interpretation of a law in its area of specific expertise—the CPA. *Converge*, 383 Md. at 466–67, 473, 860 A.2d at 873, 877. SureDeposit disagreed, arguing that the alleged violations of the CPA were dependent on whether the SDL applied, an area of law in which the Division possessed no particular expertise. *Converge*, 383 Md. at 474, 860 A.2d at 878. The Circuit Court dismissed SureDeposit's complaint, at which point SureDeposit noted an appeal to the Court of Special Appeals. *Converge*, 383 Md. at 467, 860 A.2d at 873. We issued a writ of certiorari, on our initiative and before the intermediate court could decide the appeal. *Converge*, 383 Md. at 467, 860 A.2d at 873–74. Because declaratory judgments are inappropriate remedies where the primary jurisdiction doctrine properly is implicated, *Converge*, 383 Md. at 478, 860 A.2d at 880, we were asked to consider whether the Division had "primary jurisdiction" over the subject matter of the complaint where the

4

issues raised in the complaint required interpretation of the SDL before reaching the interpretation of the CPA.[2] *Converge*, 383 Md. at 467, 860 A.2d at 874.

We began by discussing primary jurisdiction principles:

> "[Primary jurisdiction] is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies. The doctrine is not concerned with subject matter jurisdiction or the competence of a court to adjudicate, but rather is predicated upon policies of judicial restraint: "which portion of the dispute-settling apparatus—the courts or the agencies—should, in the interests of judicial administration, first take the jurisdiction that both the agency and the court have." It comes into play when a court and agency have concurrent jurisdiction over the same matter, and there is no statutory provision to coordinate the work of the court with that agency.
>
> . . .
>
> [P]rimary jurisdiction is relevant only . . . where the claim is initially cognizable in the courts but raises issues or relates to subject matter falling within the special expertise of an administrative agency."

*Converge*, 383 Md. at 478–79, 860 A.2d at 880–81 (quoting *Maryland-National Capital Park and Planning Commission v. Washington National Arena*, 282 Md. 588, 601–02, 386 A.2d 1216, 1225–26 (1978) (footnote omitted) (citations omitted)); *see SEFAC Lift & Equipment Corp. v. Mass Transit Administration*, 367 Md. 374, 380, 788 A.2d 192, 196 (2002) ("We have long held, and have recently confirmed, that '[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the

---

[2] We were asked to consider two additional questions as well, but did not reach them, resolving the appeal on the first question. *Converge Services Group, LLC v. Curran*, 383 Md. 462, 467 n.2, 860 A.2d 871, 874 n.2 (2004).

5

controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy.'" (citations omitted)). We identified several policy concerns underlying the primary jurisdiction doctrine, including preservation of a uniform regulatory scheme, and the benefit to a reviewing court of the "'special expertise and technical knowledge normally employed in administrative fact-finding and rule-making.'" *Converge*, 383 Md. at 479, 860 A.2d at 881 (quoting *Washington National Arena*, 282 Md. at 603, 386 A.2d at 1227).

We noted that in some situations, the "administrative remedy is intended by the Legislature to be exclusive and must be exhausted before recourse may be appropriate to the courts." *Converge*, 383 Md. at 481, 860 A.2d at 882. In others, the administrative process and remedy might be "intended to be primary, but not exclusive, relative to seeking judicial relief." *Converge*, 383 Md. at 482, 860 A.2d at 883; *see Prince George's County v. Ray's Used Cars*, 398 Md. 632, 645, 922 A.2d 495, 503 (2007) ("Moreover, while there is no presumption that an administrative remedy is intended to be exclusive when a recognized alternative judicial remedy exists, there is a strong presumption that the administrative remedy is intended to be primary, and . . . a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy." (internal quotations omitted)); *Public Service Commission v. Wilson*, 389 Md. 27, 86–92, 882 A.2d 849, 884–88 (2005) (requiring exhaustion of an administrative appeal process where an employee of the Maryland Public Service Commission was terminated); *N.A.A.C.P. v. Golding*, 342 Md. 663, 679, 679 A.2d 554, 562 (1996) ("Even when a dispute between an organization and its members is of a character that warrants judicial

6

intervention, courts have typically required exhaustion of internal remedies as a prerequisite to judicial involvement."). Regardless, "'when there are two forums available, one judicial and the other administrative, . . . and no statutory directive indicating which should be pursued first, a party is often first required to run the administrative remedial course before seeking a judicial solution.'" *Converge*, 383 Md. at 483, 860 A.2d at 883 (quoting *Clinton v. Board of Education*, 315 Md. 666, 678, 556 A.2d 273, 279 (1989)).

In *Converge*, we examined the relevant portion of the CPA,[3] and concluded that alleged violators were permitted ordinarily to obtain a judicial remedy only after the person was aggrieved by an order or decision by the Division. *Converge*, 383 Md. at 483–84, 860 A.2d at 883–84. We agreed with SureDeposit that the CPA did not commit exclusive administrative remedies to the Division for resolution of disputes involving the SDL, and the Division conceded that at least some of the charges were based on the SDL exclusively. *Converge*, 383 Md. at 482, 860 A.2d at 883. We concluded, however, that the mere "mixing of claimed violations from statutes within and without the agency's particular area of expertise" did not justify bifurcating the resolution of the global dispute nor did it justify exempting the matter from the initial administrative dispute resolution process. *Id.*

As SureDeposit's complaints included a request for a declaration as to the viability of the Division's CPA claims, we held that "it would be inappropriate for a court to accept that invitation in advance of the Division being allowed to bring to bear, through the

---

[3] The relevant portion of the CPA provided: "If a person is aggrieved by an order or decision of the Division, he may institute any appropriate proceeding he considers necessary." Md. Code (1975, 2000 Repl. Vol.), Commercial Law Article, § 13-407.

7

designated regulatory scheme, its particular expertise to render a final administrative decision regarding the CPA matters." *Converge*, 383 Md. at 485, 860 A.2d at 884. We held further that an administrative determination by the Division as to the charges of SureDeposit's alleged violations of the CPA might be helpful to a court considering the related allegations as to violations of the SDL, *Converge*, 383 Md. at 483, 860 A.2d at 883, even though the Division "may not [have] possess[ed] statutorily-recognized expertise regarding the assessment of matters arising under the SDL." *Converge*, 383 Md. at 486, 860 A.2d at 885.

*Converge* provides a friendly analogy in the present case for two reasons. First, the Union is similar to an administrative agency in that both have non-judicial processes that must be exhausted generally before recourse to a Maryland court is appropriate. *See Walsh v. Communications Workers of America, Local 2336*, 259 Md. 608, 612, 271 A.2d 148, 150 (1970) ("Maryland law has long recognized the rule that a union member must exhaust the remedies open to him under the union rules before [he or she] can seek aid from the courts unless the union procedure is procedurally or substantively inadequate, fraudulent or otherwise arbitrary and illegal."). In cases such as this one, where a union and Maryland courts have a sort of concurrent jurisdiction over a dispute that, at its heart, arises from an internal union affair, union members should first exhaust their own processes. Requiring resort first to the internal processes might have resolved creatively and satisfactorily what

8

would otherwise blossom into contentious claims.[4]  If union members decide to bring a suit after the internal process has been exhausted, reviewing courts would have the benefit of the union's "take" on the claims.

Second, *Converge* teaches that, even though claims before an administrative agency may implicate matters outside of their expertise, there are good reasons nonetheless to allow a reviewing administrative agency to grapple with those parts of the dispute for which they may be able to do.  *Converge*, 383 Md. at 483, 485–86, 860 A.2d at 883–85. Because the defamation claim is grounded in a core Union function—namely, the allegedly false and defamatory statements made by David A. McClure ("McClure") about Lovelace's discharge of his duties as Treasurer of the Union prior to and during a Union election campaign—the Union is equipped by its own internal processes to deal with the underlying conflict in a way that might have avoided or mitigated significantly the harms claimed to have been suffered by Lovelace, thus mitigating his provable damages.

As noted in the Majority opinion, § 22.1 of the Union's constitution provided a mechanism for McClure to be charged with and disciplined for misconduct.  Maj. Slip. Op. at 6.  McClure could have been suspended potentially from office, declared ineligible for office, or otherwise disciplined.  *Id.*  Section 14.8 permitted Lovelace to challenge the

---

[4] For example in the present case, had Lovelace invoked timely the union process, he may have been able to secure a determination that what McClure said about him in his conduct of the role of Union Treasurer was false, similar to what he was able to convince the jury in the defamation action.  Such a determination could have been made public as a means to clear the air before the Union election.  Were that done, perhaps he would not have lost the election.  The relative certainty of this benevolent prediction is not important, only that it is reasonably possible, in justifying requiring exhaustion of the internal Union remedies first.

9

conduct or results of an election, apparently on any grounds. Maj. Slip. Op. at 6–7. The Union could have determined that Lovelace was slandered unfairly leading up to or during the election campaign and could have ordered that a new election be held. *Id.* Although these possible avenues of remedy would not have provided Lovelace with the substantial monetary damages awarded to him by the jury, all or a substantial part of the damages may have avoided or mitigated.

The Majority seems unwilling to speculate as to whether the internal union procedures would have awarded Lovelace the full relief he sought, and instead prefers to allow the jury verdict to stand. Some speculation, though, is unavoidable on either side of our respective reasoning. *See Public Service Commission*, 389 Md. at 90–91, 882 A.2d at 887 (engaging in a similar speculation analysis as to the potential outcome of an administrative appeal process where an employee of the Maryland Public Service Commission was terminated); *Golding*, 342 Md. at 683, 679 A.2d at 563–64 (engaging in a similar speculation analysis as to the potential outcome of internal mechanisms for challenging elections of a voluntary membership organization). As noted by the Majority opinion, Lovelace convinced successfully a jury that McClure defamed him, and he obtained a verdict against the Union and McClure of approximately $425,000.00. Maj. Slip. Op. at 2–3. The jury was able to engage in a certain degree of speculation in coming to its verdict; appellate courts also are able to speculate that exhaustion of internal union procedures may have obviated the need for Lovelace's defamation action or at least mitigated his damages. Who can say with certainty that Lovelace's apparent ability to convince a jury would not have translated into a similarly successful effort to convince a

10

union trial board that McClure's remarks were false and/or that a new election would be appropriate in view of that finding. At the least, allowing the union grievance process to have run its course would seem provident in order to determine whether mitigation or elimination of the basis upon which monetary damages could be proven for any vestigial injury due to defamation or the lost election.

Lovelace's failure to avail himself of the available union procedures in a timely manner should result in loss of the victory represented by the jury verdict here. Although such an outcome for Lovelace may be unfortunate, as enough time has passed such that the lost election can no longer be run anew, the result is, in my view, required before we cast aside so quickly the exhaustion requirement. Accordingly, I would reverse the judgment of the Court of Special Appeals and remand the case to that Court with directions to vacate the judgment of the Circuit Court for Baltimore City and assess costs in all courts against Lovelace.